UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INFECTION PREVENTION
TECHNOLOGIES, LLC,

               Plaintiff,                        Civil Action No. 10-cv-12371

        v.                               District Judge Victoria A. Roberts
                                      Magistrate Judge Laurie J. Michelson

UVAS, LLC and LUMALIER,
CORPORATION,

               Defendants.
_____/

**REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTIONS TO DISMISS [11, 14]**

Plaintiff Infection Prevention Technologies, LLC ("IPT" or "Plaintiff") filed this suit against

Defendant-Patentee UVAS, LLC ("UVAS") and Defendant-Licensee Lumalier Corporation

("Lumalier") seeking a declaratory judgment that IPT's product, an ultraviolet sanitation device,

does not infringe three of UVAS's patents: U.S. Patent Nos. 6,656,424 ("'424 patent"), 6,911,177

("'177 patent"), and 7,175,806 ("'806 patent"). IPT has additionally brought claims of tortious

interference with business relations; injurious falsehood, slander, and/or defamation; and a Lanham

Act false advertising claim against both Defendants.

Presently before this Court for Report and Recommendation are Defendants' motions to

dismiss raising numerous grounds. (Dkts. 11, 14.) UVAS contends that this Court cannot exercise

personal jurisdiction over it, that no justiciable case or controversy exists between itself and

Plaintiff, that Plaintiff has failed to adequately plead a false advertising claim under the Lanham

Act, and that Plaintiff's state-law claims are pre-empted. (*See generally* Dkt. 11, UVAS's Mot.)

In the alternative, UVAS asks this Court to transfer the case to the United States District Court for

South Carolina.  (*See id.*)

Like UVAS, Lumalier's motion seeks dismissal on the basis that no Article III case or controversy between itself and IPT exists, that Plaintiff's Lanham Act claim fails to allege facts upon which relief may be granted, and that Plaintiff's state law claims are pre-empted.  In lieu of contesting personal jurisdiction, however, Lumalier asserts that because this Court lacks such jurisdiction over UVAS—and UVAS is an indispensable party—IPT's Complaint against Lumalier must be dismissed.  (*See generally* Dkt. 14, Lumalier's Mot.)[1]  Plaintiff filed an extended Response (Dkt. 17) addressing both Defendants' motions, and Defendants have each filed a Reply (Dkts. 18, 19).  This Court heard oral argument on July 21, 2011.  (*See* Dkt. 22)

For reasons that follow, this Court RECOMMENDS that:

(1) IPT's Complaint against UVAS be DISMISSED WITHOUT PREJUDICE because this Court cannot exercise personal jurisdiction over UVAS;

(2) Count III, seeking declaratory judgment of non-infringement of the '806 patent, be DISMISSED WITHOUT PREJUDICE as to both Defendants because UVAS is a necessary and indispensable party with regard to that count;

(3) if this Report and Recommendation is adopted, IPT file a motion to amend Counts IV, V, and VI, within 30 days of the Report's adoption, and that, if the motion to amend is denied, Counts IV and V of the Complaint insofar as they are premised on allegedly false statements of patent infringement, and Count VI be DISMISSED WITH PREJUDICE as against Lumalier.

---

[1]Lumalier has not moved for transfer, but states that if this Court determines that transfer is appropriate it would "consent to jurisdiction in the appropriate federal court in South Carolina." (Dkt. 19, Lumalier's Reply at 1 n.1.)

## I. BACKGROUND[2]

The claimed technology of the '424 and '177 patents relates to "a method and device for sterilizing rooms and similar enclosed areas." (Dkt. 1, Compl. Exs. A, B.)  The '806 patent relates to a "C-Band Disinfector that disinfects objects placed within the device by subjecting the objects to closed-loop emissions of UV-C radiation."  (Compl. Ex. C.)  Jeffrey Deal, M.D. is the named inventor on these three patents (the "patents-in-suit").  (Dkt. 11-2, Deal Aff. ¶ 2; *see also* Compl. Exs. A-C.)

By assignment from Dr. Deal, Defendant UVAS is the present holder of the patents-in-suit. (Deal Aff. ¶ 2.)  UVAS is a three person South Carolina limited liability company. (Deal Aff. ¶ 5.) Dr. Deal is one of UVAS's three members and is its managing member.  (Deal Aff. ¶ 4.)  UVAS asserts, and IPT does not dispute, that UVAS has no employees or physical presence in Michigan, is not registered to do business in Michigan, and does not manufacture, market, or sell products in Michigan.  (*See* Dkt. 11, UVAS's Mot. at 1; Dkt. 17, IPT's Resp. at 7-10; Deal Aff. ¶¶ 6-8, 11, 17, 19-22, 24.)

Defendant Lumalier, a Tennessee corporation with its principal place of business in Tennessee, is in the ultraviolet disinfection device business.  (Compl. ¶ 3; *see also* Deal Aff. ¶ 40.) By way of a license agreement with UVAS, Defendant Lumalier has the exclusive right to exploit the technology claimed in the '424 and '177 patents.  (Dkt. 18-1, Deal Supp. Decl., Exs A-C.) Although it appears that Lumalier maintains no offices in Michigan (Deal Aff. ¶ 41), IPT asserts that

---

[2]The Court may consider affidavits in deciding whether a justiciable case or controversy exists.  Applicable legal standards for Defendants' Fed. R. Civ. P. 12(b)(1), (b)(2), and (b)(6) motions will be discussed below and only the proper materials will be considered in deciding each basis for dismissal.

Lumalier has clients or customers in Michigan, and also has sales representatives in the State (Pl.'s Resp. at 7, Ex. 4 (printout from Lumalier's website showing six Michigan clients)).

Plaintiff IPT is a nine-member Michigan limited liability company that manufactures and sells devices related to hospital sanitation. (Compl. ¶ 1.) IPT's devices compete with Lumalier's. (Compl. ¶¶ 3, 18, 19.)

### A. IPT and UVAS Discuss But Do Not Enter Into a Licensing Agreement

In May 2009, IPT and UVAS discussed the possibility of a license agreement. (Compl. ¶ 11.) IPT asserts that it informed UVAS that if UVAS had agreements with Lumalier that would prevent an agreement with IPT, the two companies could "simply go [their] separate ways." (Compl. ¶ 11.) Discussions ensued, however, and drafts of an agreement were exchanged. (Dkt. 17-2, Kenny Decl. ¶ 3; *see also* Deal Aff. ¶ 43; Compl. ¶¶ 12, 13.) According to IPT, during these discussions, Dr. Deal asserted that UVAS would sue IPT if IPT introduced "any product that competed with the Tru-D device sold by Lumalier." (Kenny Decl. ¶ 3; *see also* Compl. ¶ 13.)

On July 2, 2009, Dr. Deal informed IPT that UVAS had entered into an extended agreement with Lumalier, and that any agreement between IPT and UVAS would require Lumalier's cooperation. (Kenny Decl. ¶ 5; *see also* Deal Aff. ¶ 44.) The referenced extended agreement appears to be a Patent License Agreement executed by UVAS and Lumalier on June 30, 2009. (Dkt. 19, Ex. G, License.) (This agreement, along with a Second Addendum executed in September 2009, is central to the parties' dispute over personal jurisdiction and, accordingly, the terms of the agreement are addressed in some detail below.) According to IPT, Chuck Dunn, President of Lumalier, informed IPT that it could not enter into a license agreement with UVAS. (Kenny Decl. ¶ 5.)

4

On July 30, 2009, Thomas Kenny, one of IPT's nine members, wrote to UVAS about IPT's plans to release a product that competes with the technology covered by the patents-in-suit, yet, according to IPT, does not infringe those patents.  Specifically, Kenny explained,

> I am writing to hopefully clear up any issue regarding your patents. As you know, Infection Protection Technologies, LLC is planning to introduce a UV-C radiation device for hospital sanitation purposes. When we last spoke, you indicated that if our company introduced any UV-C sanitation device, that you would sue for infringement of U.S. Patent Nos. 6,656,424 and 6,911,177.
>
> We have given your patents serious consideration, and believe that we have developed a solution that fully avoids your patent claims. . . . We trust that if you analyze your patents as we have, you will come to the same conclusion. If you do not, please let us know so that we may evaluate whether we should address your concerns.

(Deal. Aff., Ex. C; *see also* Compl. ¶¶ 14-15.)  That same day, Dr. Deal responded, "I do not recall ever mentioning an[y] legal actions that we would take unless we were advised of a patent infringement.  This is a complex legal issue and I am forwarding this email to our attorney for comment."  (Deal. Aff., Ex. C.)

On August 25, 2009, IPT wrote a follow-up to UVAS: "I have not heard from you in quite some time.  Please let us know by the end of the month whether you disagree with our conclusion." (Compl. ¶ 17.)  Apparently, UVAS never responded.

### B.  IPT Introduces a Competing Product and UVAS Informs IPT of Patent Rights

IPT alleges that in the months following its last attempt to contact UVAS in August 2009, it spent "significant resources" on engineering, building prototypes, and developing marketing plans for its own UV-C sanitation product.  (Compl. ¶ 17-18.)  Then, on March 18, 2010, counsel for UVAS sent a letter to several persons at IPT, including Kenny.  The letter provides, in relevant part:

> We write on behalf of our Client UVAS, LLC, and its exclusive

> licensee Lumalier Corporation. Our Client respects the intellectual property rights of others, and expects others to respect the time and expense that UVAS, LLC and its licensee have invested in creativity, research and development, manufacturing, and in acquiring intellectual property rights.
>
> Our Client is the owner of the following United States Patents directed to devices and methods for ultraviolet disinfection of areas: U.S. Patent Nos.: 6,656,424, 6,911,177 and 7,175,806. . . .
>
> It has come to our attention that you have caused, or intend to cause, to be manufactured and sold a device for ultraviolet disinfection of areas, and that you intend to sell such devices in the United States of America. Please provide us with a detailed description of your ultraviolet-C disinfection device. Please provide reasons why this device, or the use of this device, does not infringe one or more claims of our Client's patents listed above.
>
> We look forward to your prompt reply.

(Deal Aff., Ex. A; *see also* Compl. ¶ 19.)

IPT's counsel responded on April 7, 2010, as follows:

> As indicated in your letter, you are aware that IPT has marketed disinfection products. The products marketed by IPT are explained in detail on its website located at: www.infectionprevention technologies.com.
>
> Your letter identifies three patents purportedly owned by your client, UVAS, LLC. We have reviewed U.S. Patent Nos. 6,656,424, 6,911,177 and 7,175,806 in detail. We are confident that the devices marketed by IPT do not infringe any patent rights claimed in these patents. . . .

(Kenny Decl., Ex. A; *see also* Compl. ¶ 19.)

### C. Lumalier and Dr. Deal Allegedly Contact IPT's Potential Customers

IPT directs the Court's attention to three communications from Lumalier and/or Dr. Deal that allegedly interfered with IPT's attempts to sell one of its devices. (Pl.'s Resp. at 5-6.) The first involves a potential IPT sale to Triumph Healthcare ("Triumph"), a hospital headquartered in

Missouri.  (Kenny Decl. ¶ 14.)  IPT alleges that in April 2010, it presented its product to a Dr.
Stienecker in Ohio (for use at Triumph), and Dr. Stienecker allegedly told IPT that Lumalier had
previously informed him that Lumalier would sue and thereby prevent Triumph from using IPT's
product.  (*Id.*)  In support of this allegation, IPT has produced a May 5, 2010 email from Dr.
Stienecker to IPT which provides:

> As you know, I am interested in purchasing an UV light system for
> hospital room/OR decontamination. I am exploring offers from
> several companies.  One of the companies has alleged that your unit
> infringes their patent. Before we proceed further with your offer, I
> need to have assurances that you have a legal right to sell your UV
> light unit.
>
> Furthermore, I am concerned that even if you have a body of
> evidence to support your legal right to sell your unit that a patent
> infringement suit will be filed and the ensuing legal battle will
> consume all financial resources available to your company rendering
> my unit useless and without support even if no restraining order is
> placed against the use of my unit.

(Kenny Decl., Ex. B.)  IPT suggests that Lumalier's communications with Dr. Stienecker were
successful in dissuading Triumph from purchasing a UV-C device from IPT.  (*See* Pl.'s Resp. at 5.)

Second, also in April 2010, a representative of MetroHealth Medical Center
("MetroHealth"), which is located in Wyoming, Michigan, allegedly told IPT that "Lumalier's sales
representatives had informed [MetroHealth] that IPT's device infringed their patents and that
Lumalier has demanded that IPT cease marketing their product."  (Kenny Decl. ¶ 17; *see also*
Compl. ¶ 20.)  IPT allegedly addressed MetroHealth's concerns and, according to IPT, there was
still a possibility of MetroHealth purchasing an IPT product. (Kenny Decl. ¶ 17.) However, on June
8, 2010, Lumalier sent the following letter to MetroHealth:

7

> We write on behalf of our client, Lumalier Corporation. . . .
>
> Our client is the exclusive licensee of the following United States Patents directed to devices and methods for ultraviolet disinfection of areas: U.S. Patent Nos.: 6,656,424, and 6,911,177. Our client's license of these patents gives it the right to prevent others from making, using or selling devices and methods covered by its patents. This letter serves as notice to you of our client's patent rights.
>
> It has come to our attention that you are considering the use or purchase of an ultraviolet disinfection device from Infection Prevention Technologies of Auburn Hills, MI. The Infection Prevention Technologies device and the method it employs are not licensed by our client, or by its licensor, UVAS, LLC. Use of the Infection Prevention Technologies device may infringe on one or more claims of the patents listed above. We recommend that you carefully consider your position resulting from the use or purchase of the Infection Prevention Technologies device.

(Kenny Decl., Ex. D; *see also* Compl. ¶ 20; Lumalier's Mot. at 19 n.7.) IPT has not alleged that this letter resulted in a lost sale. (*See* Compl. ¶ 20; Pl.'s Resp. at 6; Kenny Decl. ¶ 17.)

Third, IPT asserts that on May 28, 2010, Dr. Deal, who has a dual role as Lumalier's Chief Science Officer and UVAS's manager, contacted University Community Hospital ("UCH") in Florida. Dr. Deal attempted to call UCH to inquire where the hospital obtained its ultraviolet disinfection system. (Deal. Aff. ¶ 47.) It appears that Dr. Deal also contacted UCH through its website:

> Not sure who to send this to, but please notify Dr. Jackie Whittaker that the device on the news last night is unlicensed technology. The patent, [is] already granted not "pending" as Infection Prevention Technologies claims. The patent is attached. Please note the dates. Already, fraudulent claims complaints [*sic*] have been made to the FDA about the brand new company called IPT. They also have done none of the studies they quote, despite claims to the contrary. You can contact Dr. Donskey or Rutalla (quoted by IPT representatives and website) for confirmation of this false claim. A friend of mine familiar with the technology called me about the news story. I thought you deserved to know.

8

(Kenny Decl., Ex. C; *see also* Compl. ¶ 21.)  IPT alleges  that this communication from Dr. Deal to UCH is attributable to both Defendants, and falsely (1) implied that IPT's "patent pending" marking referred to one of UVAS's issued patents, (2) suggested that IPT's product required a license, (3) stated that complaints have been made to the U.S. Food and Drug Administration about IPT, and (4) stated that IPT published false studies. (Pl.'s Resp. at 5; *see also* Kenny Decl. ¶ 15; Compl. ¶ 21.) Dr. Deal does not recall sending the correspondence, but asserts that if he did, "I did so in my capacity as Lumalier's Chief Science Officer.  I did not send this correspondence acting on behalf of UVAS." (Deal Supp. Decl. ¶ 12.)  IPT asserts that it was unable to make a sale to UCH.  (Kenny Decl. ¶ 15.)

## II. THIS COURT DOES NOT HAVE PERSONAL JURISDICTION OVER UVAS

Defendant UVAS asserts that Plaintiff's Complaint as against UVAS must be dismissed because this Court may not exercise personal jurisdiction over UVAS.  (UVAS's Mot. at 4-8.)  For the following reasons, this Court agrees.

### A.  Federal Circuit Law Governs The Due Process Aspect of the Personal Jurisdiction Inquiry

"The issue of personal jurisdiction in a declaratory action for non-infringement is 'intimately related to patent law' and thus governed by Federal Circuit law regarding due process." *Breckenridge Pharmaceutical, Inc. v. Metabolite Labs., Inc.*, 444 F.3d 1356, 1362 (Fed. Cir. 2006) (quoting *Silent Drive, Inc. v. Strong Indus., Inc.*, 326 F.3d 1194, 1201 (Fed. Cir. 2003)). Where, as here, a suit involves both patent and non-patent claims, Federal Circuit law nonetheless applies to the question of personal jurisdiction on the non-patent claims if "the resolution of the patent infringement issue will be a significant factor" in determining liability under those claims.  *3D Sys.,*

9

*Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373, 1377 (Fed. Cir. 1998).

Here, each of IPT's business tort claims require demonstrating that the letters sent to its customers were false, misleading, or otherwise unfair.[3]  (*See* Compl. ¶ 32-52.)  IPT has pled that "Defendants have told potential customers of IPT that IPT's product offered for sale infringes one or more of the patents in suit" and that Defendants misled customers into believing that "IPT required a license from UVAS to sell its product." (Compl. ¶¶ 20, 21.)  But statements such as these would not be false, misleading or unfair if IPT's product in fact infringes the patents-in-suit.  *See Breckenridge*, 444 F.3d at 1362 ("A claim of unfair competition in Florida . . . while elusive of precise definition, requires a plaintiff to prove, at minimum, competition and unfairness.  As the district court correctly noted, [the patent holder's] letters would neither be unjustifiable nor unfair if the implication of infringement contained therein is true.  Accordingly . . . Federal Circuit law regarding due process must be applied to the question of personal jurisdiction over [the patent holder] with respect to all claims.").

The Court notes that some of the statements made by Dr. Deal to UCH do not, taken in isolation, directly involve the patents-in-suit ("[a]lready, fraudulent claims complaints [*sic*] have been made to the FDA about the brand new company called IPT.  They also have done none of the studies they quote, despite claims to the contrary").  (Kenny Decl., Ex. C; *see also* Compl. ¶ 21.)  But in that very communication, Dr. Deal provided UCH with one of the patents-in-suit and asserted

---

[3]*Goldfaden v. Cleveland*, No. 297416, 2011 WL 2347623, at *1 (Mich. Ct. App. June 14, 2011) (providing that a prima facie case of tortious interference requires "proof that defendant acted intentionally and pursuant to an improper motive instead of legitimate business reasons"); *Kollenberg v. Ramirez*, 339 N.W.2d 176, 179 (Mich. Ct. App. 1983) (explaining that injurious falsehood involves, *inter alia*, "a false statement harmful to the interests of another"); 15 U.S.C. § 1125(a) (creating cause of action for use of a "false or misleading description of fact, or false or misleading representation of fact").

that IPT's product was "unlicensed technology." (Kenny Decl., Ex. C.) It would be a strained inference to conclude that Dr. Deal would have contacted UCH absent his (or Defendants') belief that IPT's product infringed.

In *3D Systems, Inc. v. Aarotech Laboratories, Inc.*, the Federal Circuit applied its law (rather than the Ninth Circuit's) in determining the due process aspect of the personal jurisdiction inquiry even though the complaint included state-law unfair competition claims. 160 F.3d 1373, 1377 (Fed. Cir. 1998). In reaching that determination, the Court focused on the fact that supplemental jurisdiction over state law claims exists where they arise out of the same set of facts as the patent claims: "Because of supplemental jurisdiction under 28 U.S.C. § 1367 . . . the propriety of [personal] jurisdiction in light of federal due process for both the state law claims and the federal patent law claims is to be analyzed using Federal Circuit law." *Id.* 1377-78.

Because resolution of the patent infringement claims will be a significant factor in determining liability on the other claims, Federal Circuit law controls the personal jurisdiction inquiry. No party has argued for a different result. Accordingly, this Court will apply Federal Circuit law regarding due process to all claims in this suit.[4]

### B. Lack of General Personal Jurisdiction Over UVAS

The Supreme Court has drawn a distinction between "specific" and "general" jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 423 (1984). Specific personal jurisdiction exposes a defendant to suit in the forum state only for claims that "arise out of or relate

---

[4]Assuming (without deciding) that Dr. Deal's communications to UCH are attributable to UVAS, he apparently communicated with UCH from South Carolina. UCH is in Florida. Quite clearly then, Dr. Deal did not make contact with the forum-state under either Federal Circuit or Sixth Circuit law.

to" the defendant's forum contacts.  *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985).  In contrast, general personal jurisdiction allows a defendant to be haled into the forum state even where the plaintiff's claims do not arise out of, or relate to the defendant's contacts with the forum.  *See Helicopteros*, 466 U.S. at 423.  Given the breadth of claims that may be asserted under general jurisdiction, the defendant's forum-state contacts must be substantial: they must constitute "continuous and systematic general business contacts." *Helicopteros*, 466 U.S. at 415-16; *see also Chrysler Group LLC v. South Holland Dodge, Inc.*, Nos. 10–12984, 10–13290, 10–13908, 2011 WL 1790333, at *8 (E.D. Mich. May 10, 2011).

Plaintiff, for good reason, does not contend that this Court may exercise general jurisdiction over UVAS.  It is uncontroverted that UVAS has no employees in Michigan, no physical presence in this forum, is not licensed to do business in Michigan, and sells no products in the State, (*see* Deal Aff. ¶¶ 11, 17, 20-24).  *See Helicopteros*, 466 U.S. at 416 (finding no personal jurisdiction in Texas where the defendant had no place of business in Texas and had never been licensed to do business in Texas despite that the defendant had "sen[t] its chief executive officer to Houston for a contract-negotiation session; . . . purchas[ed] helicopters, equipment, and training services from [a company located in Texas] for substantial sums; and sen[t] personnel to . . . Fort Worth for training."); *Campbell Pet Co. v. Miale*, 542 F.3d 879, 881-82 (Fed. Cir. 2008) (finding no general jurisdiction over patentee-defendant where defendant attended a conference in the forum where she demonstrated her product and offered them for sale, and additionally made twelve sales over eight years in the forum totaling about $14,000).  Accordingly, the inquiry boils down to whether this Court may exercise specific personal jurisdiction over UVAS.

### C.  Lack of Specific Personal Jurisdiction Over UVAS

A court may exercise specific personal jurisdiction over the defendant if:

> (1) the defendant purposefully directed its activities at residents of the forum, (2) the claim arises out of or relates to those activities, and (3) assertion of personal jurisdiction is reasonable and fair.  With respect to the last prong, the burden of proof is on the defendant, which must "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable" under the five-factor test articulated by the Supreme Court in *Burger King*.

*Breckenridge*, 444 F.3d at 1363 (quoting *Burger King*, 471 U.S. at 477). "The first two factors correspond with the 'minimum contacts' prong of the *International Shoe* analysis, and the third factor corresponds with the 'fair play and substantial justice' prong of the analysis." *Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1360 (Fed. Cir. 2001).  Because discovery has yet to take place, IPT need only make a *prima facie* showing that  UVAS is subject to personal jurisdiction.  Further, the pleadings and affidavits are to be read in the light most favorable to IPT.  *Elecs. for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1349 (Fed. Cir. 2003).

In its Motion to Dismiss, UVAS correctly asserted that the singular act of sending a letter to a Michigan company such as IPT (whether characterized as an innocuous request for information or full-on cease-and-desist letter) is insufficient for it to be haled into a federal court sitting in Michigan.  *Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1360-62 (Fed. Cir. 1998) ("Principles of fair play and substantial justice afford a patentee sufficient latitude to inform others of its patent rights without subjecting itself to jurisdiction in a foreign forum.  A patentee should not subject itself to personal jurisdiction in a forum solely by informing a party who happens to be located there of suspected infringement."); *see also Campbell Pet*, 542 F.3d at 885 ("As the district court correctly noted, we have fashioned a rule, as part of the 'reasonable and fair' portion

13

of the due process inquiry in personal jurisdiction cases, that, without more, a patentee's act of sending letters to another state claiming infringement and threatening litigation is not sufficient to confer personal jurisdiction in that state.").

As the Federal Circuit has made clear, "'for the exercise of personal jurisdiction to comport with fair play and substantial justice, there must be 'other activities' directed at the forum and *related to the cause of action* besides the letters threatening an infringement suit.'" *Avocent Huntsville Corp. v. Aten Int'l Co., Ltd.*, 552 F.3d 1324, 1333 (Fed. Cir. 2008) (citation omitted; emphasis in original). The Federal Circuit has provided guidance on the "other activities" sufficient to confer personal jurisdiction. In *Breckenridge Pharmaceutical, Inc. v. Metabolite Labs., Inc.*, 444 F.3d 1356 (Fed. Cir. 2006) the Court explained,

> Where a defendant-licensor has a relationship with an exclusive licensee headquartered or doing business in the forum state, the inquiry requires close examination of the license agreement. In particular, our case law requires that the license agreement contemplate a relationship beyond royalty or cross-licensing payment, such as granting both parties the right to litigate infringement cases or granting the licensor the right to exercise control over the licensee's sales or marketing activities.

*Id.* at 1362.

There is no dispute that Lumalier conducts business in Michigan, or that UVAS and Lumalier are parties to an exclusive license agreement. Certain aspects of this Patent License Agreement between UVAS and Lumalier as modified by First and Second Addendums (collectively, "Amended License"), in the language of *Breckenridge*, evidence "a relationship beyond royalty or cross-licensing payment." In fact, Lumalier, a party to the agreement and presumptively a drafter of the Amended License, points out several such clauses: under the agreement, UVAS (1) receives reports on gross sales of the licensed product; (2) controls, at least to a limited extent, whom

14

Lumalier may grant sub-licenses to; (3) pays all patent maintenance fees; and (4) may defend a declaratory judgment action brought against UVAS (and assert a counterclaim of infringement in any such action), if Lumalier declines to do so.  (Lumalier's Mot. at 8; *see also* Lumalier's Reply, Ex. G, Amended License §§ 4.1, 6.2(c), 6.4, 9.3.)  Plaintiff asserts that these types of clauses in the Amended License—along with Dr. Deal's dual role as manager of UVAS and Chief Science Officer of Lumalier—make UVAS and Lumalier's relationship even more robust than that of the licensee-licensor in *Breckenridge*.  (*See* Dkt. 17, Pl.'s Resp. at 9 (citing *Powervip, Inc. v. Static Control Components, Inc.*, No. 1:08-CV-382, 2009 WL 152106, at *5 (W.D. Mich. Jan. 21, 2009) (finding that patent cross-license agreement "contemplate[d] an ongoing relationship" where, *inter alia*, "the agreement requires the respective patentees to pay the maintenance fees and annuities on their patents as they become due")).)

Pursuant to the Federal Circuit's post-*Breckenridge* case law, however, this Court is not convinced  that an exclusive license agreement that strips the patent holder-licensor of the ability to enforce the licensed patents evidences the type of licensor-licensee relationship that justifies the exercise of specific jurisdiction over the patent holder—even if the exclusive licensee does business in the forum state.  Indeed, "[t]he crux of the issue, it appears, and the reason courts must examine exclusive license agreements closely in evaluating their jurisdictional authority over foreign patentees, is to determine whether the relationship between the patentee and the licensee is such that the patentee maintains the right (or the obligation) to pursue enforcement activities in the forum." *Viskase Companies, Inc. v. World PAC Int'l AG*, 710 F. Supp. 2d 754, 760 (N.D. Ill. 2010) (interpreting the "close examination of the license agreement" language from *Breckenridge* in light

15

of the Federal Circuit's subsequent decision in *Avocent*).[5]

In *Avocent*, the Federal Circuit, in its own words, "endeavored to reconcile [its] decisions regarding personal jurisdiction in declaratory judgment actions." *Autogenomics Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1019 (Fed. Cir. 2009). The Court explained that, in the exclusive license context, a court should continue to focus on the patent holder's enforcement activities directed at the forum state:

> [E]xclusive licensing agreements and other undertakings that impose enforcement obligations on a patentee or its licensee reflect the kind of "other activities" that support specific personal jurisdiction in a declaratory judgment action . . . .
>
> [I]f the defendant patentee purposefully directs activities at the forum which relate in some material way to the enforcement or the defense of the patent, those activities may suffice to support specific jurisdiction. For example, when the patentee enters into an exclusive license or other obligation relating to the exploitation of the patent by such licensee or contracting party in the forum, *the patentee's* contractual undertaking may impose certain *obligations* to enforce the patent against infringers. By such conduct, the patentee may be said to purposefully avail itself of the forum and to engage in activity that relates to the validity and enforceability of the patent.

*Id.* at 1335-36 (emphasis added); *see also Autogenomics*, 566 F.3d at 1020 ("Our holding in *Avocent* was that only enforcement or defense efforts related to the patent rather than the patentee's own commercialization efforts are to be considered for establishing specific personal jurisdiction in a declaratory judgment action against the patentee.").

Under the Amended License, UVAS has very limited authority to enforce patent rights in Michigan (or anywhere for that matter). The Second Addendum to the License removed § 6.2(b)

---

[5]The court in *Viskase Companies* used the term "foreign patentees" to refer to a non-U.S. patentee; for present purposes this is a distinction without a difference.

which previously reserved UVAS's right to bring a patent infringement suit should Lumalier decline to do so.  In fact, the Second Addendum states, in no uncertain terms, "Lumalier is conveyed rights to pursue patent infringement suits or other methods of relief from patent infringements as the *sole owner* of these patent rights."  (Lumalier's Reply, Ex. G, Second Addendum (emphasis added).)  And while Section 6.2(c) of the Amended License still allows UVAS to participate in a declaratory judgment action, UVAS's participation is severely circumscribed.  (Lumalier's Reply, Ex. G, Amended License § 6.2(c).)  That section provides that if Lumalier gives notice to an alleged infringer that leads to a declaratory judgment action against UVAS and/or Lumalier, *Lumalier* has the right to defend that action and file a counterclaim for patent infringement on behalf of UVAS.  (*Id.*)  Only if Lumalier "declines such defense and/or counterclaim, UVAS *may* pursue the defense and any counterclaim."  (*Id.* (emphasis added).)  Thus, the exclusive license agreement does not grant UVAS the right to enforce the '424 and '177 patents, and to the extent that it may do so in the limited context of an undefended declaratory judgment action, the language of the agreement is purely permissive—it does not obligate UVAS to enforce those patent rights.  This case is dissimilar then, in a way that strongly disfavors the exercise of specific jurisdiction, to those relied upon by IPT.  *See Akro*, 45 F.3d at 1548-49 (patentee sent enforcement letters and granted exclusive license to entity in forum state, but license obligated patentee to "defend and pursue any infringement"); *Breckenridge*, 444 F.3d at 1366-67 (patentee sent enforcement letters and granted exclusive license to entity who did business in forum state, but licensee needed patentee's consent to sue and the parties agreed to "cooperate reasonably in any enforcement actions"); *Powervip*, 2009 WL 152106, at *5 (patentee sent enforcement letters to the forum-state plaintiff, and patentee had exclusive cross-license with a company that sold products covered by the patent in the forum state, but agreement

also provided that the parties would "cooperate on the strategy of a response to . . . possible infringement" and both parties had the right to "initiate litigation against infringers").[6]

And even if this Court were to broaden its focus from just UVAS's enforcement rights under the exclusive license, the other aspects of the Amended License at best weakly favor an exercise of specific jurisdiction. First, granting a party the exclusive right to sell a patented product in the forum, without more, cannot be sufficient to hale a patentee into the forum state. The Federal Circuit has made clear that the patentee's own commercialization efforts in the state do not suffice for personal jurisdiction in the declaratory judgment context. *Avocent*, 552 F.3d at 1336 ("In short, a defendant patentee's mere acts of making, using, offering to sell, selling, or importing products—whether covered by the relevant patent(s) or not—do not, in the jurisdictional sense, relate in any material way to the patent right that is at the center of any declaratory judgment claim for non-infringement, invalidity, and/or unenforceability."). Restated, even assuming UVAS steps completely into the shoes of its exclusive licensee for purposes of selling a patented product in Michigan, IPT has not explained how Lumalier's sales in the forum warrant an exercise of personal jurisdiction over UVAS in a declaratory judgment action when UVAS's own sales of that product would not. And even if a licensee's sales might in some cases suffice to exercise personal

---

[6]*See also Viam Corp. v. Iowa Export-Import Trading Co.*, 84 F.3d 424, 430 (Fed. Cir. 1996) (finding jurisdiction over patentee where its exclusive licensee did business in the forum state and patentee participated with licensee in "establish[ing] a regular chain of distribution" but also where "[the patentee and its licensee] ha[d] [previously] initiated a suit seeking to enforce the same patent that is the subject of this suit against other parties . . . in the same district court" (emphasis added)); *Genetic Implant Sys., Inc. v. Core-Vent Corp.*, 123 F.3d 1455, 1459 (Fed. Cir. 1997) (finding jurisdiction over a patentee who contracted with an exclusive distributor to sell the patented products in the forum state but also where patentee "retained the right to pursue claims for infringement and . . . agreed to indemnify [distributor] from any third party infringement action related to [distributor's] sale, use, or making of the products").

jurisdiction over its licensor, it does not appear that UVAS had any control over Lumalier's sales activities, including whether Lumalier sold products in Michigan. *Compare* (Lumalier's Reply, Ex. G, Amended License § 5.1 (promotion carried out in Lumalier's "sole discretion")) *with Breckenridge*, 444 F.3d at 1367 ("Metabolite [the patentee] further agreed to 'provide consultation to PamLab [its exclusive licensee] in the science, medicine and marketing of vitamins and related products, from time to time.'").

Accordingly, given UVAS's lack of contacts with Michigan and lack of any enforcement obligation or retention of other substantial patent rights in the License Agreement this Court recommends dismissal of Plaintiff's Complaint against UVAS without prejudice for lack of personal jurisdiction.

## III. UVAS IS ONLY A NECESSARY AND INDISPENSABLE PARTY FOR THE RESOLUTION OF COUNT III: DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '806 PATENT

Lumalier seeks to piggy-back on UVAS's dismissal: it argues that because this Court may not exercise personal jurisdiction over UVAS, and because UVAS is a necessary and indispensable party to this litigation, IPT's Complaint against Lumalier must be dismissed under Fed. R. Civ. P. 19. (Lumalier's Mot. at 4-7.) Save one count, this Court does not believe that UVAS is necessary to adjudicate the allegations in IPT's Complaint.

The Sixth Circuit has outlined a three-step process for determining whether a party is indispensable to an action under Fed. R. Civ. P. 19. *See Keweenaw Bay Indian Cmty. v. State*, 11 F.3d 1341, 1345 (6th Cir. 1993) (citing *Local 670 v. Int'l Union, United Rubber, Cork, Linoleum, and Plastic Workers of Am.*, 822 F.2d 613, 618 (6th Cir. 1987)). First, this Court determines whether the absent party, here UVAS, is "necessary" to the action and should be joined if feasible.

19

*Id.* (citing Fed. R. Civ. P. 19(a)).  Second, if the party in question is necessary, this Court must ask whether it can be joined.  *Id.* at 1345-46 ("'If personal jurisdiction is present, the party shall be joined; however, in the absence of personal jurisdiction . . . the party cannot properly be brought before the court.'" (quoting *Local 670*, 822 F.2d at 618)).  Finally, if joinder is not feasible, this Court must decide, based on "equity and good conscience," whether the action should proceed in the party's absence or be dismissed. *Id.* (citing Fed. R. Civ. P. 19(b)).

Lumalier correctly argues that UVAS is both a necessary and indispensable party to adjudicate Count III of the Complaint.  That count seeks a declaratory judgment that "IPT has not infringed, and is not infringing, either directly or indirectly, contributorily or otherwise, any valid claim of the '806 patent."  (Compl. ¶ 30.)  It is uncontroverted that UVAS has not granted Lumalier any rights to the '806 patent under the Amended License, and IPT has not alleged that Lumalier has otherwise obtained any such rights in that patent.  (*See* Lumalier's Reply, Ex. G., Amended License; Dkt. 14-3, Dunn Decl. ¶ 3; Compl. ¶ 14; Pl.'s Resp. at 7 n.2.)  Accordingly, UVAS is the only entity with interest in that patent, and therefore, the only entity that may defend IPT's claims raised in Count III.  Plaintiff indicates, however, that it is willing to proceed with its Complaint pruned of the '806 patent  (Pl.'s Resp. at 7 n.2).  Accordingly, the Court recommends dismissal of Count III.

The Court disagrees with Lumalier that UVAS is a necessary party as to the remaining counts in the Complaint.  Under Rule 19, UVAS would be a necessary party if:

> (A) in [UVAS's] absence, the court cannot accord complete relief among [IPT and Lumalier]; or
>
> (B) [UVAS] claims an interest relating to the subject of the action and is so situated that disposing of the action in [its] absence may: (i) as a practical matter impair or impede [UVAS's] ability to protect the

interest; or (ii) leave [either IPT or Lumalier] subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

*See* Fed. R. Civ. P. 19(a)(1).

The facts alleged in the Complaint do not trigger any of the three Rule 19(a)(1) conditions. Under the Amended License, UVAS has a right to participate in a declaratory judgment action such as this *only if* Lumalier declines to participate. (Lumalier's Reply, Ex. G, Amended License § 6.2(c).) In other words, UVAS has entrusted Lumalier with the defense of its patents in the very situation presented to this Court. Therefore, regarding Rule 19(a)(1)(A), the Court can afford IPT all the relief it requests regarding the '424 and '177 patents absent UVAS—even if such relief requires claim construction or an invalidity analysis.

Similarly, proceeding without UVAS would not, as a practical matter impede UVAS's ability to protect its interest in the '424 and '177 patents. *See* Fed. R. Civ. P. 19(a)(1)(B)(i). This Court has reasoned that UVAS's inability to enforce (and very limited ability to defend) the '424 and '177 patents renders the exercise of personal jurisdiction over it unconstitutional. It necessarily follows that the prejudice to UVAS resulting from denying it the opportunity to exercise those very limited enforcement rights is minimal. This is especially so given Lumalier's presence in the litigation, which, once again, is what was contemplated by UVAS in executing its agreement with Lumalier.

Finally, proceeding with this suit would not subject either IPT or Lumalier to "a substantial risk of incurring double, multiple, or otherwise inconsistent obligations." *See* Fed. R. Civ. P. 19(a)(1)(B)(ii). As between IPT and Lumalier, the Court notes that any counterclaim for infringement is compulsory, *3D Systems, Inc. v. Envisiontec, Inc.*, 575 F. Supp. 2d 799, 805 n.2 (E.D. Mich. 2008), and, therefore, the shields of collateral estoppel and res judicata would

21

presumptively be available to those parties in a future suit involving the '424 and '177 patents. Thus, the primary concern here is the possibility that UVAS, the presumptive non-party to this action, would later attempt to sue IPT for infringement.  But as discussed, UVAS has granted Lumalier the sole right to bring infringement actions.   (Lumalier's Reply, Ex. G, Second Addendum.)

In  *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870 (Fed. Cir. 1991), the alleged infringer asserted that an exclusive licensee could not maintain an infringement action against it without joinder of the patentee.  *Id.* at 873.  The Court reasoned that the licensee could proceed on its own if the patentee had assigned "all substantial rights" to the patent-in-suit. Although the patentee retained certain sublicensing control and a right to receive damages from an infringement suit, critically, "[t]he agreements . . . transferred the right to sue for infringement [to the exclusive licensee] . . . subject only to the obligation to inform [the patentee]."  *Id.* at 875.  The Federal Circuit explained that

> This grant is particularly dispositive here because the ultimate question confronting us is whether [an exclusive licensee] can bring suit on its own or whether [the patentee] must be joined as a party. The policy underlying the requirement to join the owner when an exclusive licensee brings suit is to prevent the possibility of two suits on the same patent against a single infringer. . . .  This policy is not undercut here because the right to sue rested solely with [the exclusive licensee]. . . .   The district court's decision, and our affirmance thereof, assure that the provisions of [Rule 19] have not been transgressed: complete relief can be afforded among those already parties and there is no substantial risk of a party incurring double obligations.

*Id.* at 875-76.  Accordingly, the appellate court concluded that the patentee was not a necessary party under Rule 19(a).  *See id.* at 876 n.1.

This Court recognizes that *Vaupel* did not involve a declaratory judgment action such as the

22

present one, and therefore, the Federal Circuit's reasoning regarding sufficient transfer of rights for exclusive licensee standing is irrelevant here.  But for purposes of analyzing whether IPT will be exposed to inconsistent or double obligations if this action proceeds, the focus is on UVAS's hypothetical future claim for infringement.  In this regard, *Vaupel* is instructive: specifically, as in *Vaupel* "there is no substantial risk of [IPT] incurring double obligations" because Lumalier has the exclusive right to sue.[7]  This Court therefore does not find that UVAS is a necessary party to this action under Rule 19(a)(1)(B)(ii).

At the hearing, Lumalier stressed that two cases demand a different result because of the possibility of prejudice to *UVAS*.  The Court finds both cases readily distinguishable.[8]  In *Messerschmitt-Boelkow-Blohm GmbH v. Hughes Aircraft Co.*, 483 F. Supp. 49, 52-53 (S.D.N.Y. 1979), the court found that the patentee-licensor was a necessary party to a declaratory judgment action for patent invalidity where the exclusive licensee had the right to control litigation over the patent and the right to join the patentee.  But, as opposed to this case, prior to the declaratory judgment action the patentee in *Messerschmitt* brought suit against its licensee "alleging that the exclusive license . . . had been obtained by fraudulent misrepresentation and concealment" and sought "recission of the license." *Id.* at 51.  This fact was critical to the court's Rule 19 analysis:

> The rationale of the general rule is that, whether the exclusive license is considered an assignment of all the patentee's rights or not, the owner suffers no prejudice from a judgment of invalidity in his

---

[7]The Court further notes that this does not appear to be a concern to IPT as it acknowledged, during the hearing, that UVAS is not an indispensable party.

[8]The Court also notes that nothing prevents UVAS from waiving personal jurisdiction and appearing in this suit.  Further, at the hearing, when the Court inquired as to whether UVAS believed it was an indispensable party, UVAS declined to take a position and made no arguments as to whether it would be prejudiced if this suit proceeds without it.

> absence if by agreement he has entrusted the licensee with the right to protect his interests by suing for infringement. This rationale is undermined when in a separate non-collusive action filed prior to the declaratory suit[,] . . . the patent owner charges that the exclusive license agreement is void because fraudulently obtained and seeks its recission. A finding that the owner/licensor is indispensable *in this factual context* is analogous to holding[] that an assignor is indispensable in a suit against an assignee where the assignor disputes the validity of the assignment.

*Id.* at 52 (emphasis added). The ongoing contest over the validity of the licensor-licensee agreement in *Messerschmitt* during the pendency of the declaratory judgment action is in stark contrast to the speculative possibility that UVAS might someday regain rights to enforce the '177 and the '424 patents.

This Court finds Lumalier's reliance on *Tycom v. Redactron Corp.*, 380 F. Supp. 1183 (Del. 1974) similarly misplaced. There, as opposed to here, the licensee was under obligation to the patentee "to commence a patent infringement suit promptly" or else the patentee could "institute such a suit 'on the same terms and conditions as the rights granted to [the patentee].'" *Id.* at 1190. The Court concluded that the patentee "appears to have a contractual right to have [its licensee] sue to protect his interest in the patent and to be joined as a party plaintiff to such a patent infringement suit. Allowing the present infringement suit to continue without [the patentee] as a party would clearly be prejudicial to [the patentee's] contractual rights." *Id.* at 1190. Here, as discussed, UVAS retains no rights to be involved in an infringement suit involving the '177 or the '424 patent.

In sum, this Court concludes that UVAS is a necessary and indispensable party under Rule 19 as far as adjudicating Count III of the Complaint. But as for the remaining counts, UVAS is not a necessary party under Rule 19(a), and IPT may proceed with those counts against Lumalier in the absence of UVAS.

24

## IV.  COUNTS I AND II OF THE COMPLAINT PRESENT A JUSTICIABLE CASE OR CONTROVERSY BETWEEN LUMALIER AND IPT[9]

Lumalier argues that Counts I and II of IPT's Complaint—counts seeking a declaration of non-infringement of the '424 and '177 patents, respectively—must be dismissed because no justiciable case or controversy exists as between Lumalier and Plaintiff.  This Court is unpersuaded.

### A.  Legal Standards

#### 1.  The Type of Evidence that this Court May Consider on a Motion to Dismiss For Lack of Subject Matter Jurisdiction

Lumalier's assertions that Plaintiff's declaratory claims present no justiciable case or controversy is a challenge to this Court's subject matter jurisdiction over those claims.  *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126-27 (2007).  As such, Fed. R. Civ. P. 12(b)(1) applies.  This matters because the Sixth Circuit[10] has provided different legal standards for "facial" and "factual" attacks under Rule 12(b)(1):

> At the outset we must emphasize a crucial distinction, often overlooked, between 12(b)(1) motions that attack the complaint on its face and 12(b)(1) motions that attack the existence of subject matter jurisdiction in fact, quite apart from any pleadings. The facial attack does offer similar safeguards [to motions under Fed. R. Civ. P. 12(b)(6)] to the plaintiff: the court must consider the allegations of the complaint as true.  The factual attack, however, differs greatly for

---

[9]Because this Court recommends dismissal of UVAS for lack of personal jurisdiction, the remainder of its motion, including its request to transfer this case to South Carolina, is rendered moot and denied without prejudice.  Accordingly, the Court focuses on Lumalier's remaining arguments for dismissal.

[10]The Court recognizes that Federal Circuit case law governs "[w]hether an actual case or controversy exists so that a district court may entertain an action for a declaratory judgment of non-infringement."  *Adenta GmbH v. OrthoArm, Inc.*, 501 F.3d 1364, 1369 (Fed. Cir. 2007).  However, it appears that Sixth Circuit case law governs the procedural aspects of a motion challenging declaratory judgment jurisdiction in a patent suit.  *See 3D Systems, Inc. v. Envisiontec, Inc.*, 575 F. Supp. 2d 799, 804 (E.D. Mich. 2008).

> here the trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. Pro. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover the plaintiff will have the burden of proof that jurisdiction does in fact exist.

*RMI Titanium Co. v. Westinghouse Electric Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996) (emphasis removed) (quoting *Mortensen v. First Federal Sav. & Loan Ass'n*, 549 F.2d 884, 890-91 (3d Cir. 1977)).

While neither party addressed this issue, after an examination of Lumalier's arguments, it appears that it challenges the factual predicates underlying IPT's claims of non-infringement. Lumalier asserts that it has not "communicated to any of Plaintiff's actual or prospective customers the allegation that Plaintiff was infringing," asserts that certain allegations in Plaintiff's Complaint are hearsay and not attributable to Lumalier, and relies on the affidavit of its CEO in support of its Motion. (*See* Lumalier's Mot. at 10 & n.4.) And to the extent it is relevant, IPT also implores the Court to examine letters and other communications sent to it or its potential customers and relies on the affidavit of one its members. (*See* IPT's Resp. at 13.) Accordingly, this Court is faced with a "factual" dispute over its subject matter jurisdiction.

> 2. *The Federal Circuit's Case or Controversy Standard Post MedImmune v. Genentech*

Prior to the Supreme Court's decision in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007), federal courts used a two-pronged test to determine whether an actual controversy existed in patent declaratory judgment actions. Under this prior test, the plaintiff had the burden of

establishing that: (1) it had actually produced or was prepared to produce an allegedly infringing

product, and (2) the defendant's conduct created an objectively "reasonable apprehension" that the

defendant would initiate suit if the plaintiff continued the allegedly infringing activity. *Sony Elecs.,*

*Inc. v. Guardian Media Techs., Ltd.*, 497 F.3d 1271, 1283 (Fed. Cir. 2007); *see also Teva Pharm.*

*USA, Inc. v. Novartis Pharm. Corp.*, 482 F.3d 1330, 1334–36 (Fed. Cir. 2007). However, in

*MedImmune*, the Supreme Court rejected the Federal Circuit's "reasonable apprehension" of suit

test. *Id.* at 132 n.11; *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1380 (Fed. Cir.

2007); *see also Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1363 (Fed. Cir. 2009)

("Intentionally or not, *MedImmune* may have lowered the bar for determining declaratory judgment

jurisdiction in all patent cases; certainly it did so in the licensor-licensee context."); *Micron Tech.,*

*Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 902 (Fed. Cir. 2008) ("[T]he now more lenient [case or

controversy] standard facilitates or enhances the availability of declaratory judgment jurisdiction

in patent cases."). The Supreme Court explained that there is no bright-line rule for determining

whether a dispute rises to the level of a constitutional controversy. Instead what is required is

> that the dispute be definite and concrete, touching the legal relations
> of parties having adverse legal interests; and that it be real and
> substantial and admit of specific relief through a decree of a
> conclusive character, as distinguished from an opinion advising what
> the law would be upon a hypothetical state of facts.

*MedImmune*, 549 U.S. at 127 (internal quotation marks omitted).

Therefore, following *MedImmune*, "[a] party seeking to base jurisdiction on the Declaratory

Judgment Act bears the burden of proving that the facts alleged, 'under all the circumstances, show

that there is a substantial controversy, between the parties having adverse legal interests, of

sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Benitec*

*Australia, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1343 (Fed. Cir. 2007).   Proving a reasonable apprehension of suit, however, remains "one of multiple ways that a declaratory judgment plaintiff can satisfy the more general all-the-circumstances test to establish that an action presents a justiciable Article III controversy." *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1336 (Fed. Cir. 2008) (citing *Caraco Pharm. Labs., Ltd. v. Forest Labs., Ltd.*, 527 F.3d 1278, 1291 (Fed. Cir. 2008)).

### B.  A Justiciable Case or Controversy Exists Between Lumalier and IPT

In this case, the totality of the circumstances show that there is a substantial controversy of sufficient immediacy between Lumalier and IPT.  First is a March 18, 2010 letter from UVAS's counsel.  This letter was sent on "behalf of our Client UVAS, LLC, *and its exclusive licensee Lumalier Corporation*."  (Deal. Aff., Ex. C (emphasis added).)  In fact, Lumalier acknowledges that through this letter it "sought information from Plaintiff to assist in patent evaluation."  (Lumalier's Mot. at 10.)  That letter, sent to at least three people at IPT, provides, in relevant part:

> We write on behalf of our Client UVAS, LLC, and its exclusive licensee Lumalier Corporation.  Our Client respects the intellectual property rights of others, and expects others to respect the time and expense that UVAS, LLC and its licensee have invested in creativity, research and development, manufacturing, and in acquiring intellectual property rights.
>
> Our Client is the owner of the following United States Patents directed to devices and methods for ultraviolet disinfection of areas: U.S. Patent Nos.: 6,656,424, 6,911,177 and 7,175,806. . . .
>
> It has come to our attention that you have caused, or intend to cause, to be manufactured and sold a device for ultraviolet disinfection of areas, and that you intend to sell such devices in the United States of America. Please provide us with a detailed description of your ultraviolet-C disinfection device. Please provide reasons why this device, or the use of this device, does not infringe one or more claims of our Client's patents listed above.

28

We look forward to your prompt reply.

(Deal Aff., Ex. A.)  Lumalier characterizes this letter as an innocuous request for information, but the Court is not persuaded that this is such an apt characterization.

The letter explicitly identifies the patents-in-suit and tells IPT that it "expects" IPT to "respect the time and expense that UVAS, LLC and its licensee have invested."  It informs IPT that the patents are directed to devices and methods for "ultraviolet disinfection of areas" and that it has come to UVAS's attention that IPT also plans to produce "a device for ultraviolet disinfection of areas."  The letter essentially asks IPT to prove why its device "does not infringe one or more claims of [UVAS's] patents"—and to do so "prompt[ly]."  This suggests a belief by Lumalier that the IPT product does infringe.  Admittedly, the letter does not outright assert infringement, present the claims of the referenced patents, or explain how the patents-in-suit read on IPT's devices.  But post-*MedImmune*, courts must carefully scrutinize artfully crafted attorney letters that omit these red flags.  *Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1363 (Fed. Cir. 2009) ("The purpose of a declaratory judgment action cannot be defeated simply by the stratagem of a correspondence that avoids the magic words such as 'litigation' or 'infringement.' . . .  It is implausible (especially after *MedImmune* and several post *MedImmune* decisions from this court) to expect that a competent lawyer drafting such correspondence for a patent owner would identify specific claims, present claim charts, and explicitly allege infringement.").

More telling, however, are two communications from Lumalier to potential IPT customers.  First, IPT asserts that when it contacted Dr. Stienecker regarding a potential sale to Triumph Healthcare in Missouri, Dr. Stienecker told IPT that Lumalier had informed him that they would sue to prevent Triumph from using IPT's product.  (Pl.'s Resp. at 5-6.)  While IPT's allegation is

29

hearsay, Dr. Stienecker's letter to IPT is not.  There the physician stated:

> As you know, I am interested in purchasing an UV light system for hospital room/OR decontamination. I am exploring offers from several companies. One of the companies has alleged that your unit infringes their patent. Before we proceed further with your offer, I need to have assurances that you have a legal right to sell your UV light unit.
>
> Furthermore, I am concerned that even if you have a body of evidence to support your legal right to sell your unit that a patent infringement suit will be filed and the ensuing legal battle will consume all financial resources available to your company rendering my unit useless and without support even if no restraining order is placed against the use of my unit.

(Kenny Decl., Ex. B.)  Dr. Stienecker's letter plainly states that a company informed him that IPT's unit infringed their patent.  And while the letter does not reference Lumalier by name, it is a known competitor of IPT and in view of another communication by Lumalier to a potential IPT customer (discussed next), the Court believes the inference is a reasonable one and will draw it.

Lumalier also sent the following warning letter to MetroHealth Medical Center in Wyoming, Michigan:

> We write on behalf of our client, Lumalier Corporation. . . .
>
> Our client is the exclusive licensee of the following United States Patents directed to devices and methods for ultraviolet disinfection of areas: U.S. Patent Nos.: 6,656,424, and 6,911,177. Our client's license of these patents gives it *the right to prevent others* from making, using or selling devices and methods covered by its patents. *This letter serves as notice to you of our client's patent rights.*
>
> It has come to our attention that you are considering the use or purchase of an ultraviolet disinfection device from Infection Prevention Technologies of Auburn Hills, MI. *The Infection Prevention Technologies device and the method it employs are not licensed by our client, or by its licensor, UVAS, LLC.* Use of the Infection Prevention Technologies device *may infringe* on one or more claims of the patents listed above. We recommend that you

>*carefully consider your position* resulting from the use or purchase of
>the Infection Prevention Technologies device.

(Kenny Decl., Ex. D (emphases added).)  Lumalier asserts that it "has not communicated to any actual or prospective customers of [IPT] the allegation that IPT is infringing on the patents licensed to Lumalier."  (Dunn. Decl. ¶ 7.)  Perhaps because Lumalier used the word "may," this letter to MetroHealth does not outright assert that IPT's product infringes the '424 and '177 patents; but for purposes of the case-or-controversy analysis, it gets close enough.  *See D & R Comm'ns, LLC v. Garett*, No. 11–0413, 2011 WL 2418246, at *4 (D.N.J. June 13, 2011) ("The assertions in the letter to [declaratory judgment plaintiff's customers's] that [plaintiff] *may* have violated [patentee's] patent . . . combined with the statements that [plaintiff] knew about the invention and was unauthorized to promote or use it were at the very least an implied allegation of infringement, which leads to an actual controversy." (emphasis added)).

Given Lumalier's participation in the March 18, 2010 letter to IPT, and Lumalier's attempt to dissuade two potential IPT customers from purchasing IPT products by asserting its patent rights, under the totality of the circumstances a case or controversy between IPT and Lumalier exists as to whether IPT's product infringes the '424 or '177 patent.  Accordingly, the Court does not recommend dismissal of Counts I and II against Lumalier on the basis that no Article III case or controversy exists as between IPT and Lumalier.

## V.  LUMALIER'S RULE 12(b)(6) MOTION TO DISMISS COUNTS IV, V AND VI

IPT asserts that UVAS and Lumalier made a number of false statements to IPT's potential customers thereby disrupting potential sales.  To recover for these allegedly wrongful acts, Plaintiff proffers three legal theories: tortious interference with business relations (Count IV); injurious falsehood, defamation, and slander (Count V); and false advertising under the Lanham Act, 15

31

U.S.C. § 1125(a) (Count VI).  (Compl. ¶¶ 20, 21, 32-52.)  Lumalier asserts that these counts should be dismissed because Plaintiff has failed to adequately plead damages.  (Lumalier's Mot. at 13-15.)  Next, Lumalier argues that IPT's Lanham Act claim should be dismissed because its communications to IPT's potential customers were not "commercial advertising or promotion" as that term is used in 15 U.S.C. § 1125, and because IPT has not pled that Lumalier's communications to IPT's potential customers deceived a "substantial segment of the intended audience."  (Lumalier's Mot. at 18-19.)  In addition, Lumalier moves to dismiss IPT's two state-law claims on grounds of federal preemption—that a patentee, acting in good faith, has the right to inform others of perceived infringement without being subject to state-law tort claims.  (Lumalier's Mot. at 11-13.)  Similarly, Lumalier asserts that the interplay between the Patent Act and the Lanham Act grants a patentee the right to inform others, in good faith, of infringement without being subject to a false advertising claim under 15 U.S.C. § 1125.  (Lumalier's Mot. at 15-18.)  The Court takes these myriad grounds for Fed. R. Civ. P. 12(b)(6) dismissal in turn and then summarizes its conclusions in a single section below.

### A.  Legal Standards

Under Rule 12(b)(6), a case warrants dismissal if it fails "to state a claim upon which relief can be granted."  When deciding a motion under Rule 12(b)(6), "[t]he court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true," and determine whether the plaintiff has alleged "enough factual matter" to "state a claim to relief that is plausible on its face."  *Cline v. Rogers*, 87 F.3d 176, 179 (6th Cir. 1996); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court

32

to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556).   The plausibility standard does not require a plaintiff to plead facts showing that liability is probable, "but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).   Where a complaint pleads facts that are "merely consistent with" a defendant's liability, a plaintiff has failed to "nudge[]" his claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 557.

### B.  To the Extent that Counts IV, V and VI Require IPT to Plead Damages, IPT Has Adequately Done So, or Should Be Given Leave to Amend To Do So

As to Counts IV, V and VI, Lumalier asserts: "Plaintiff has failed to identify any specific damage incurred, or probable damage likely to occur, as a result of the Defendants' alleged actions. Plaintiff has not recited one contract that was breached, or even one potential contract that was not consummated, in connection with the allegations against Defendants."  (Lumalier's Mot. at 13.)

In each of these Counts, Plaintiff asserts that "IPT was damaged as a result of Defendant's actions." (Compl. ¶¶ 37, 43, 51.)  While legal conclusions such as these do not withstand a motion to dismiss, *Iqbal*, 129 S.Ct. at 1949-50, IPT has further pled that Defendants falsely accused IPT of patent infringement, and "falsely impl[ied] that a license is necessary for purchase of IPT's products." (Compl. ¶ 21.)  IPT also alleged that Defendants have wrongly accused IPT of engaging in false advertising.  (Compl. ¶ 22.) Defendants allegedly made these accusations to potential IPT customers such as MetroHealth and UCH.  (Compl. ¶¶ 21, 22.)  Drawing reasonable inferences in favor of IPT then, this Court is able to conclude that IPT's potential customers took these accusations seriously, and moreover, that IPT expended additional resources in an attempt to complete the sale to these potential customers (assuming, that is, that IPT did not lose the sale

altogether).  Accordingly, the Court does not recommend dismissal of Counts IV, V and VI for

failure to plead damages with specificity.[11]

### C.  Plaintiff's Complaint Presently Fails to State a Lanham Act Claim Upon Which Relief May be Granted

Lumalier asserts that two elements of IPT's Lanham Act claim have not been sufficiently

pled: (1) that Lumalier's communications to IPT's potential customers constituted "commercial

advertising or promotion" within the meaning of the Act, *see* 15 U.S.C. § 1125(a)(1), and (2) that

Lumalier's communications would have deceived a "substantial segment of the intended audience,"

*see Am. Council of Certified Podiatric Physicians and Surgeons v. Am. Bd. of Podiatric Surgery*,

185 F.3d 606, 613 (6th Cir. 1999).  (Lumalier's Mot. at 16-18.)

Section 43(a) of the Lanham Act provides,

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . .
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or

---

[11]To the extent that Lumalier believes this inference is, in the language of *Iqbal*, possible but not plausible, the Court notes that IPT has averred that it was ultimately unable to sell a product to UCH.  (Kenny Decl. ¶ 15.)  IPT has further attested that Lumalier contacted Triumph Healthcare with allegations of infringement, and that Triumph Healthcare "did not purchase a device from IPT." (Kenny Decl. ¶ 15, Ex. B.)  While this Court may not look beyond the Complaint in deciding a motion to dismiss pursuant to Rule 12(b)(6), the present record suggests that IPT could plead damages with the requisite specificity if given leave to amend.  Accordingly, this Court is not convinced that leave to amend would be futile, and should the District Court find that damages are not presently adequately pled, this Court recommends that IPT be given leave to amend to remedy that deficiency.

she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

To state a cause of action for misleading advertising or promotion under the Lanham Act, a plaintiff must establish the following: (1) the defendant has made false or misleading statements of fact concerning his own product or another's; (2) the statement actually or tends to deceive a substantial portion of the intended audience; (3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; (4) the advertisements were introduced into interstate commerce; and (5) there is some causal link between the challenged statements and harm to the plaintiff. *Am. Council*, 185 F.3d at 613.

As a threshold matter, Lumalier contends that the letters referenced in Plaintiff's complaint do not constitute "commercial advertising or promotion." *See* 15 U.S.C. § 1125(a). Lumalier urges this Court to apply the rule of *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, where the Seventh Circuit stated "we [previously] held that letters sent to customers do not come within the scope of § 43(a)(1)(B)—which is limited to false or misleading 'commercial advertising or promotion' and does not cover all deceitful business practices." 316 F.3d 731, 733 (7th Cir. 2003). However, the Seventh Circuit appears to be alone among the Courts of Appeals in using a bright-line rule. *See Carpenter Tech. v. Allegheny Technologies*, 646 F. Supp. 2d 726, 737 n.9 (E.D. Pa. 2009) ("While the Seventh Circuit has established this rule of law, no other circuits appear to have adopted a similar line of reasoning to create a per se rule as to when letters to consumers can be the basis of a Lanham Act claim.").

In fact, at least the First, Second, Fifth, Ninth, and Tenth Circuits have adopted the test announced in *Gordon and Breach Science Publishers S.A. v. American Inst. of Physics*, 859 F. Supp.

1521, 1536 (S.D.N.Y. 1994): "commercial advertising or promotion" is (1) commercial speech;[12]
(2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of
influencing customers to buy defendant's goods or services; (4) that is disseminated sufficiently to
the relevant purchasing public to constitute advertising or promotion within that industry.  *See*
J. Thomas McCarthy, 5 *McCarthy on Trademarks and Unfair Competition* § 27:71 (4th ed. 2007)
(citing *Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc.*, 332 F.3d 6 (1st Cir. 2003);
*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48 (2d Cir. 2002); *Procter &
Gamble Co. v. Haugen*, 222 F.3d 1262, 56 U.S.P.Q.2d 1098 (10th Cir. 2000); *Coastal Abstract
Service, Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725 (9th Cir. 1999); *Seven-Up Co. v. Coca-Cola
Co.*, 86 F.3d 1379 (5th Cir. 1996)).  In addition, at least two courts of this district, *Champion Labs.,
Inc. v. Parker-Hannifin Corp.*, 616 F. Supp. 2d 684, 694 (E.D. Mich. 2009) (Borman, J.); *Int'l
Techs. Consultants, Inc. v. Stewart*, 554 F. Supp. 2d 750, 755 (E.D. Mich. 2008) (Cook, J.), and
other district courts in the Sixth Circuit, *White Mule Co. v. ATC Leasing Co.*, 540 F. Supp. 2d 869,
897 (N.D. Ohio 2008); *Kansas Bankers Sur. Co. v. Bahr Consultants, Inc.*, 69 F. Supp. 2d 1004,
1012-13 (E.D. Tenn. 1999), have adopted the *Gordon and Breach* test.

   This test recognizes that the answer to the promotional question turns on the nature of the
industry.  Where, for example, an industry consists of a limited number of players, it is sensible to

---

   [12]Commercial speech is "speech which does no more than propose a commercial
transaction." *Gordon and Breach*, 859 F. Supp. at 1537 (quoting *City of Cincinnati v. Discovery
Network, Inc.*, 507 U.S. 410, 422 (1993)).  Courts in the Sixth Circuit have struggled to define
commercial speech. *See White Mule Co. v. ATC Leasing Co. LLC*, 540 F. Supp. 2d 869, 897 (N.D.
Ohio 2008) (citing *Semco v. Amcast, Inc.*, 52 F.3d 108, 111-14 (6th Cir. 1995); *Kan. Bankers Surety
Co. v. Bahr Consultants, Inc.*, 69 F. Supp. 2d 1004, 1012-14 (E.D. Tenn. 1999)).  Lumalier does not
assert that the communications alleged in the Compliant are not "commercial speech," and,
accordingly, this Court does not discuss the requirement further.

conclude that letters sent to a handful of them can rise to the level of "commercial advertising or promotion."  *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1386 (5th Cir. 1996) ("Where the potential purchasers in the market are relatively limited in number, even a single promotional presentation to an individual purchaser may be enough to trigger the protections of the Act."); *Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.*, 880 F. Supp. 1005, 1020-21 (S.D.N.Y. 1994) (finding single letter was sufficient dissemination to constitute advertising or promotion where "the relevant purchasing market is quite small—tainting the goodwill of plaintiff with one purchaser could easily affect another purchaser's view."); *Int'l Techs. Consultants*, 554 F. Supp. 2d at 758 (finding two written communications sufficient to constitute "commercial advertising or promotion" where market for designing float glass facilities was at most 20 to 25 customers in a given year). Accordingly, this Court concludes that the mere fact that IPT's Complaint specifies only two Lumalier communications to potential customers does not, by itself, warrant dismissal as a matter of law.

The question still remains whether, under the "significant penetration of the target market" prong, the Complaint adequately pleads "commercial advertising or promotion."  IPT has pled that "IPT believes that the false and misleading statements . . . made by the defendant are more extensive than described herein. Pursuant to Fed. R. Civ. P. 11(b)(3), the allegations of false and misleading statements beyond those described above are likely to have further evidentiary support after a reasonable opportunity for further investigation or discovery."  (Compl. ¶ 22.)  The Court empathizes with IPT's position: absent discovery, it is perhaps difficult for IPT to determine which hospitals Lumalier contacted, and this is the very information it needs to state a Lanham Act claim. (*See* IPT's Resp. at 22.)  But the Sixth Circuit has recently recognized that under *Twombly* and

*Iqbal*, plaintiffs may be faced with such a "Catch-22":

> [*Twombly* and *Iqbal*'s] new 'plausibility' pleading standard causes a considerable problem for plaintiff here because defendants . . . are apparently the only entities with the information [necessary for pleading plaintiff's cause of action]. . . . Before *Twombly* and *Iqbal*, courts would probably have allowed this case to proceed so that plaintiff could conduct discovery in order to gather the pricing information that is solely retained within the accounting system of [defendants]. . . . The plaintiff apparently can no longer obtain the factual detail necessary because the language of *Iqbal* specifically directs that no discovery may be conducted in cases such as this, even when the information needed to establish a claim of discriminatory pricing is solely within the purview of the defendant or a third party, as it is here.

*New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, __ F.3d __, 2011 WL 2448909, at *3 (6th Cir. Jun. 21, 2011); *see also* Scott Dodson, *Federal Pleading and State Presuit Discovery*, 14 LEWIS & CLARK LAW REVIEW 43, 44 (2010) (explaining that *Twombly* and *Iqbal*'s "newly-minted 'plausibility' regime . . . implicates high stakes for plaintiffs proceeding with claims that depend upon facts exclusively in the hands (or minds) of defendants and third parties. The plaintiff may need those facts to plead her claim properly under *Twombly* and *Iqbal*, but she may not be able to discover those facts unless she can survive a motion to dismiss.").

Moreover, and less easily excused, is IPT's failure to plead the relevant market for ultraviolet disinfection devices. How and to whom IPT markets its products should be information within IPT's possession. In fact, Lumalier, also a competitor in the ultraviolet disinfection device arena, suggests that the customer pool consists of over 5,000 hospitals. (Lumalier's Mot. at 19, Ex. F.) Further, IPT's "belie[f]" that Lumalier's statements "are more extensive" than the two communications specifically pled still does not quantify (even by way of belief or estimate) how many consumers in the relevant purchasing public Lumalier contacted. Absent allegations as to

either the size of the relevant market or the number of entities within that market that Lumalier contacted, it remains entirely speculative as to whether Lumalier's communications have been "disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion within that industry." *See Gordon and Breach*, 859 F. Supp. at 1536. Unlike the inference of damages, the Court cannot reasonably infer that contacting two (perhaps more?) out of an unknown number of consumers renders it plausible that Lumalier's statements significantly penetrated the relevant market. While it is reasonable to infer from the allegations in the Complaint that Lumalier *possibly* engaged in commercial advertising or promotion, that is not the pleading standard under Rule 8. *See Iqbal*, 129 S. Ct. at 1950 ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citing Fed. R. Civ. P. 8(a)(2))); *Twombly*, 550 U.S. at 557 ("The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) [liability] reflects the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.'"). Accordingly, IPT has not adequately pled that Lumalier's communications constitute "commercial advertising or promotion."

Lumalier also claims that IPT has not adequately pled the third element of the *Gordon and Breach* test—that Lumalier's communications were for the purpose of influencing consumers to buy its goods or services. (Lumalier's Mot. at 17.) Specifically, Lumalier asserts that "[a] review of Lumalier's letters reflects an absence of any promotion of, or even reference to, *any* of Lumalier's products." (*Id.*) The Court does not agree. The Complaint avers that Lumalier contacted MetroHealth with a letter suggesting that IPT's product was "not licensed" and that Lumalier told

39

MetroHealth that IPT was asked to stop marketing its product "because it infringed UVAS's patents. (Compl. ¶ 20.)   Drawing all reasonable inferences in favor of IPT from the allegations set forth in paragraph 20 of the Complaint, it is plain that when Lumalier contacted a potential customer of its competitor, and warned that customer that its competitor's product may infringe patent rights it held, Lumalier promoted their exclusively licensed product over their competitor's "not licensed" product. *See Int'l Techs. Consultants*, 554 F. Supp. 2d at 755-56 (finding promotion element of *Gordon and Breach* test adequately pled where letter defendant sent to plaintiff's client did not explicitly urge client to hire defendants instead of plaintiff but "the unmistakable meaning and intent of the letter" was to promote defendants' services over plaintiff's).

Next, Lumalier asserts that Plaintiff's Lanham Act claim should be dismissed because IPT has not adequately pled that "the statement[s] [it made] actually or tends to deceive a substantial portion of the intended audience." (Lumalier's Mot. at 17-18.)   Although the second element of the *Am. Council* test is separate from the "commercial advertising or promotion" requirement, Lumalier essentially treats the two as one.   Specifically, regarding the deception-of-a-substantial-portion-of-the-intended-audience requirement, Lumalier argues,

> The hospital market consists of substantially more than the two potential customers with whom Lumalier is alleged to have communicated. . . .   In fact, the American Hospital Association identifies over 5,000 registered hospitals.   Plaintiff alleges Lumalier sent letters to two.   Plaintiff's Complaint simply lacks sufficient allegations regarding commercial advertising and the deceptive effect thereof on a "substantial segment" of the market, so the Lanham Act unfair competition claim (Count VI) must be dismissed.

(Lumalier's Mot. at 18-19.)   But this Court has already concluded that IPT's Complaint is deficient because it fails to allege that Lumalier's false statements significantly penetrated the relevant market.   This would seem to account for Lumalier's argument regarding the second *Am. Council*

40

element and, to that extent, the Court does not see the need for IPT to plead with more specificity.

To the extent that this second requirement involves the distinct question of whether Lumalier's statements would actually or tend to deceive persons responsible for purchasing ultraviolet disinfection products (e.g., physicians or hospital administrators) the Court notes that "[w]here statements are literally false, a violation may be established without evidence that the statements actually misled consumers." *Am. Council*, 185 F.3d at 614. Here, reading the Complaint in the light most favorable to IPT, IPT has pled that certain statements are literally false. In particular, IPT avers "Defendants requested that IPT cease marketing its product because it infringed UVAS's patents. This statement is false and/or misleading. . . . [T]he Defendants have never requested that IPT cease marketing its product." (Compl. ¶ 20; *see also* Compl. ¶ 21 (asserting that "Defendants also falsely assert that IPT has made 'false claim[s] in its advertising.'").) Second, a plaintiff normally demonstrates actual deception through "consumer surveys, market research, or direct evidence that individual consumers were deceived." *See Am. Council*, 185 F.3d at 616-17. But the sufficiency of that evidence is more appropriately tested on a motion for summary judgment, not on one that attacks the sufficiency of the pleadings. Finally, the Court notes that IPT has also sought injunctive relief (Compl. at 13, ¶ E), and "'injunctive relief may be obtained by showing only that the defendant's representations about its product have a tendency to deceive consumers.'" *Am. Council*, 185 F.3d at 618. Given Dr. Stienecker's letter to IPT stating, "[o]ne of the companies has alleged that your unit infringes their patent. Before we proceed further with your offer, I need to have assurances that you have a legal right to sell your UV light unit," a reasonable inference is that

41

Lumalier's assertions of patent infringement have at least a tendency to deceive.[13]  Accordingly, the Court finds that IPT's Complaint is not deficient as to the second *Am. Council* element.

### D.  To the Extent that Counts IV, V and VI Relate to Patent Infringement, IPT Has Not Pled Bad Faith As Required By The Patent Act

Ancillary to a patentee's right to exclude, "a patentee must be allowed to make its rights known to a potential infringer so that the latter can determine whether to cease its allegedly infringing activities, negotiate a license if one is offered, or decide to run the risk of liability and/or the imposition of an injunction."  *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1374 (Fed. Cir. 2004).  Accordingly, federal patent law "preempts state-law tort liability for a patent holder's good faith conduct in communications asserting infringement of its patent and warning about potential litigation."  *Id.* at 1374.  Thus, to avoid preemption, "bad faith must be alleged and ultimately proven, even if bad faith is not otherwise an element of the tort claim." *Id.* (quoting *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1355 (Fed. Cir. 1999)).

In addition, although not properly termed preemption because it involves a conflict between statutes of equal stature, the Federal Circuit has engrafted a similar "bad faith" element to false advertising claims under 15 U.S.C. § 1125(a).  In *Zenith*, the Court held,

> before a patentee may be held liable under § 43(a) for marketplace activity in support of its patent, and thus be deprived of the right to make statements about potential infringement of its patent, the marketplace activity must have been undertaken in bad faith. This prerequisite is a function of the interaction between the Lanham Act and patent law, and is in addition to the elements required by § 43(a) itself, as § 43(a) alone does not require bad faith.

---

[13]The Court recognizes that Dr. Stienecker's letter is not part of the Complaint; however, the letter at least goes to the futility of amending Plaintiff's Complaint to more sufficiently plead a tendency to deceive.

*Zenith Elecs. Corp.*, 182 F.3d at 1355.

The test for bad faith consists of both objective and subjective components. *Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*, 524 F.3d 1254, 1260 (Fed. Cir. 2008). The objective prong requires an alleged infringer to demonstrate that the patentee's allegations were so "objectively baseless" that "no reasonable litigant could reasonably expect success on the merits." *Id.* at 1260 (quoting *GP Indus., Inc. v. Eran Indus., Inc.*, 500 F.3d 1369, 1374 (Fed. Cir. 2007)). "[I]f the patentee knows that the patent is invalid, unenforceable, or not infringed, yet represents to the marketplace that a competitor is infringing the patent, a clear case of bad faith representations is made out." *Zenith Elecs. Corp.*, 182 F.3d at 1354.

Plaintiff asserts that it has adequately pled "bad faith." This Court disagrees. In each of Count IV, V and VI, IPT asserts that Defendants' "actions were in bad faith, willful, wanton." (Compl. ¶¶ 38, 44, 52.) But these statements are pure legal conclusions insufficient to state a claim upon which relief may be granted. *Iqbal*, 129 S.Ct. at 1949-50 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . . . Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."); *see also Viskase Companies, Inc. v. World PAC Intern. AG*, 710 F. Supp. 2d 754, 757 (N.D. Ill. 2010) ("Undoubtedly mindful of its pleading requirements . . . plaintiff recites in the complaint that defendants sent the letters, 'purposefully and in bad faith,' in an effort to harm plaintiff's business by 'creating the false perception in the marketplace' that plaintiff's products infringed the asserted patent. The complaint as a whole, however, does not support these conclusory allegations, which are insufficient to raise plaintiff's right to relief under this standard 'above the

speculative level.'"); *GMP Techs., LLC v. Zicam, LLC*, No. 08 C 7077, 2009 WL 5064762, at *3 (N.D. Ill. Dec. 9, 2009) ("Turning to the Amended Complaint, [plaintiff] repeatedly alleges that [the patentees] took certain actions 'deliberately and intentionally,' 'with intent' and 'in bad faith.' These legal conclusions are not entitled to any weight, and cannot salvage [plaintiff's] state-law claims from preemption.").

In addition, the Complaint asserts that "there is no evidence to support the Defendants' statement that IPT's product infringes the patents-in-suit." (Compl. ¶ 20.) But this is essentially another way of saying that Defendants' allegations of infringement were false and, critically, fails to plead that Defendants *knew* that no evidence supported their infringement allegations. Perhaps Plaintiff sought to cure this defect by pleading that Defendants made the statements "knowing the statement[s] to be false." (Compl. ¶ 41.) This gets closer; but the allegation remains problematic because nowhere in the Complaint does Plaintiff suggest how or why Defendants knew (or should have known) their statements were false when they made them. *Compare Sandisk Corp. v. LSI Corp.*, No. C-09-02737, 2009 WL 3047375, at *3 (N.D. Cal. Sept. 18, 2009) ("In a conclusory fashion, [declaratory judgment plaintiff] also states that [patentee-defendant] knew or should have known that the information it provided was false. [Plaintiff], however, provides no factual support for this statement.") *with Reid-Ashman Mfg., Inc. v. Swanson Semiconductor Serv., L.L.C.*, No. C-06-4693, 2007 WL 1394427, at *9 (N.D. Cal. May 10, 2007) (finding bad faith adequately pled where, *inter alia*, complaint alleged that (1) patentee had never adequately inspected the accused product prior to suit and (2) the pictures patentee took of allegedly infringing product were of a

prototype rather than of the product).[14]

The Court agrees with IPT, however, that Plaintiff was not required to plead bad faith for Counts IV, V and VI to the extent that those counts are not premised on allegedly false statements of patent infringement.  In particular, IPT has pled that in communications to UCH, "Defendants also falsely assert[ed] that IPT has made 'false claim[s] in its advertising.'" (Compl. ¶ 21.) Apparently, IPT refers to the following statement made by Dr. Deal to UCH: "Already, fraudulent claims complaints [sic] have been made to the FDA about the brand new company called IPT. They also have done none of the studies they quote, despite claims to the contrary."  (Kenny Decl., Ex. C; *see also* Compl. ¶ 21.)   These statements have nothing to do with patent infringement. Accordingly, the bad faith requirement under *Zenith Elecs. Corp.* and its progeny is inapplicable insofar as Counts IV, V and VI are not premised on Lumalier's statements regarding infringement.

### E.  Conclusion as to Lumalier's Motion to Dismiss Counts IV, V and VI

The Court has concluded that the Patent Act essentially adds a bad faith element to the causes of action pled in Counts IV, V and VI, and the Complaint does not contain sufficient factual allegations for the Court to draw an inference of bad faith.  The Court has also concluded that Plaintiff's Lanham Act claim is not adequately pled because the Complaint does not permit this Court to reasonably infer that Lumalier's communications to IPT's potential customers constitute "commercial advertising or promotion."

In its Response, Plaintiff requests that should this Court find pleading deficiencies in the Compliant, that the Court grant leave to amend.  (Pl.'s Resp. at 18, 20.)  Raising this request in a

---

[14]In the Motion pleadings, Defendants indicate that they do not yet know whether the IPT product infringes.  It could, therefore, have been bad faith for Lumalier to make statements suggesting the product does infringe—but this has not been pled in the Complaint.

response brief is procedurally improper, however.  *Jung v. Certainteed Corp.*, No. 10-2557, 2011 WL 772907, *1 (D. Kan. Mar. 1, 2011) ("Generally, a plaintiff's bare request in a response to a motion to dismiss is not a proper vehicle for seeking leave to amend.") (citing *Calderon v. Kansas Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1186 (10th Cir. 1999)); *see also* Fed. R. Civ. P. 7(b)(1) ("A request for a court order must be made by motion." ); E.D. Mich. LR-App'x ECF, R5(e) ("[A] response or reply to a motion must not be combined with a counter-motion.  Papers filed in violation of this rule will be stricken.").  In addition to depriving the Court of briefing on Fed. R. Civ. P. 15 standards and how they apply to the facts of this case, the request is improper because the Court cannot readily determine whether leave should be granted without a proposed amended complaint.  *See* E.D. Mich. L.R. 15.1 ("Any amendment to a pleading . . . must, except by leave of court, reproduce the entire pleading as amended, and may not incorporate any prior pleading by reference.").

But IPT's general point is well-taken.  Lumalier has not convinced this Court that the nature of the pleading deficiencies summarized above necessarily renders amendment futile.  In particular, the record is not well-developed on Lumalier's investigation, if any, into whether IPT's product infringes the '424 and '177 patents.  As to the commercial advertising or promotion question, Lumalier's citation to the 5,000 hospitals registered with the American Hospital Association is not enough to convince the Court that amendment would be futile.  IPT should have an opportunity to plead how it markets its product and how many customers Lumalier has contacted within that market.

Accordingly, this Court proposes the following.  If this Report and Recommendation is adopted by the District Court, Plaintiff  be given 30 days from the date of adoption to file a well-

supported motion to amend and accompanying proposed amended complaint.  Should IPT fail to do

so, Counts IV and V will be dismissed to the extent that they are premised on Lumalier's allegedly

false accusations of patent infringement, and Count VI will be dismissed in its entirety.  This will

also be the outcome if Lumalier successfully opposes IPT's motion to amend.

## VI.  CONCLUSION AND RECOMMENDATION

For the foregoing reasons, this Court RECOMMENDS:

(1) IPT's Complaint against UVAS be DISMISSED WITHOUT PREJUDICE because this Court

cannot exercise personal jurisdiction over UVAS;

(2) Count III, seeking declaratory judgment of non-infringement of the '806 patent, be DISMISSED

WITHOUT PREJUDICE as to both Defendants because UVAS is a necessary and indispensable

party with regard to that count;

(3)  if this Report and Recommendation is adopted, IPT file a motion to amend Counts IV, V, and

VI, within 30 days of the Report's adoption, and that, if the motion to amend is denied, Counts IV

and V of the Complaint insofar as they are premised on allegedly false statements of patent

infringement, and Count VI be DISMISSED WITH PREJUDICE as against Lumalier.

## VII.  FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

The parties to this action may object to and seek review of this Report and Recommendation

within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).

Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*,

474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States*

*v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections,

but failing to raise others, will not preserve all the objections a party may have to this Report and

Recommendation.  *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal

quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  A copy of any objections is to be served

upon this magistrate judge.  E.D. Mich. LR 72.1(d)(2).  Once an objection is filed, a response is due

within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service

of the response.  E.D. Mich. LR 72.1(d)(3), (4).

 s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: July 25, 2011

---

## PROOF OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record via the
Court's ECF System and/or U.S. Mail  on July 25, 2011.

s/Jane Johnson
Case Manager to
Magistrate Judge Laurie J. Michelson
